## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DISH NETWORK L.L.C.
and NAGRASTAR LLC,

     Plaintiffs,

     v.

ONE BOX TV, LLC
and DONNA FOGLE,

     Defendants.

Case No. 8:19-cv-2147-T-30SPF

### DECLARATION OF NICK SAYEEDI

I, Nick Sayeedi, of Englewood, Colorado declare as follows:

1.     I make this declaration based on my personal knowledge and, if called on to testify, would testify as stated herein. I serve as Senior Vice President, Deputy General Counsel and Chief Compliance Officer of Plaintiff DISH Network L.L.C. My responsibilities include overseeing the legal aspects of launching and operating Sling TV, a live over-the-top multichannel video business provided by DISH's affiliate Sling TV L.L.C.

2.     I understand that the document attached as Exhibit 1 was produced in response to a subpoena that DISH and co-plaintiff NagraStar LLC served on PayArc, LLC, which I am told is a merchant processing service used by the Defendants in this case. The document purports to be a reseller license agreement between Sling TV L.L.C. and Defendant One Box TV, LLC, allegedly signed by myself and Defendant Donna Fogle as each company's respective representative.

3.     I reviewed the business records of Sling TV L.L.C. and there is no record of Sling TV L.L.C. having entered into any agreement with either Defendant. Moreover, Sling TV L.L.C. does not enter into reseller license agreements of the sort attached as Exhibit 1. I never met with,

1

corresponded with, or spoken to Defendant Donna Fogle or any other person that I know to have been associated with Defendant One Box TV, LLC.  I never signed the agreement that is attached as Exhibit 1, and never gave Defendants or any other person or entity authorization to either forge my signature or use my signature, such as by taking my signature from another online source and adding it to this agreement without my permission.

4.      The alleged agreement between Sling TV L.L.C. and Defendant One Box TV, LLC may have been fabricated based upon the documents attached as Exhibit 2, which are printouts of two agreements found on the webpages available at http://emecloud.com/reseller-application-and-license-agreement/ and http://emecloud.com/emecloud-confidentiality-agreement/.  The language in the purported Sling TV L.L.C. agreement attached as Exhibit 1 is nearly identical to the language in the agreements attached as Exhibit 2 and therefore may have been copied from these agreements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2020.

Nick Sayeedi

# EXHIBIT
# 1

This Reseller License Agreement ("Agreement") is between SLING TV, LLC., a Colorado Limited Liability Company ("SLING TV"), with its principal offices located at 9601 S. Meridian Blvd, Englewood, CO 80112-5905 and the entity ("Reseller") named at the end of this agreement on the signature lines provided. You agree that electronic communication (including email) between SLING TV and you, both now and in the future, is an acceptable and reasonable means of communication.

## Recitals

SLING TV is the designer and producer of a unique Internet Television Service that is intended to provide a fully functional Streaming Television environment through a combination of certain proprietary software, platforms, and processes (collectively, "SLING TV Solution"). Reseller desires to acquire a limited use license for the components comprising the SLING TV Solution from SLING TV, private label the solution if they so choose, and then resell the SLING TV Solution to Reseller's end user clients ("Clients") under Reseller's designated trade name. NOW THEREFORE, for the mutual promises and covenants described in this Agreement, SLING TV and Reseller hereby agree as follows:

## Terms & Conditions

## 1) Definitions

a) "Entity" shall mean any natural person, corporation, general Reseller, limited Reseller, limited liability company or Reseller, proprietorship, other business organization, trust, union, association or governmental authority. b) "Reseller" means any entity that distributes, resells, or markets services developed and/or hosted by SLING TV. c) "SLING TV Solution" shall mean and include the combination of all hardware and software designated by SLING TV as comprising the SLING TV Solution which may be modified or updated by SLING TV from time to time. d) "SLING TV Trademarks" means all names, marks, logos, designs, trade address and other brand designation used by SLING TV in connection with the SLING TV Solution. e) "Agreement" shall mean, collectively, this Reseller Application and License Agreement. f) "Confidential Information" shall have that definition ascribed to it in Section 10, below. g) "End-Client" shall mean any Entity for whom Reseller provides one or more elements of the SLING TV Solution. h) "SLING TV Control Panel" shall mean the SLING TV Reseller website that allows users to add, remove or otherwise manipulate the elements of the SLING TV Solution. i) "Private Label" shall mean that definition ascribed to it in Section 3(d), below. j) "Service Order" shall mean the application designated by SLING TV to be used by Reseller to purchase services or services from SLING TV and/or to license software from SLING TV accessed in the SLING TV Control Panel. The application may be amended from time to time by SLING TV. k) "Channel List" shall mean all available channels distributed by the SLING TV Solution accessible on the SLING TV Control Panel or at https://www.sling.com/channels.

## 2) Restrictions

a) Non-Circumvention. During the term of this Agreement, except as expressly provided in this Agreement, SLING TV shall not intentionally communicate with any End-Client about the SLING TV Solution so long as SLING TV is made aware of the identity of Reseller's End-Clients. The parties agree that Reseller and/or Reseller's designated agent shall be the primary point of contact with each End-Client. b) Non-Solicitation. SLING TV agrees that during the term of this Agreement and for a period of twenty-four (24) months thereafter, SLING TV shall refrain from soliciting Reseller's End-Clients for the provision of the SLING TV Solution. This prohibition shall not apply where SLING TV terminates this Agreement for Cause (See Section 10). The parties acknowledge and agree that advertisements and solicitations of SLING TV that are directed toward the public in general, or business discussions initiated by Reseller's End-Clients, shall not be a breach of this section. c) Nondisclosure. SLING TV further agrees not to disclose any information to any third party that identifies End-Client or End-Client's use of the SLING TV Solution without the express written consent of Reseller. Notwithstanding the forgoing, SLING TV shall be permitted to collect and report information about the use of the SLING TV Solution by Resellers and End-Clients for SLING TV's research purposes, provided however, that such information is collected and used in a de-identified manner. d) Opportunity Registration. If the Reseller registers his opportunities and complies with the requirements of the Registration Program, SLING TV will protect the end-client opportunity.

## 3) Services - Branding

a) License Grant. Subject to Reseller's material compliance with the terms of this Agreement, SLING TV hereby grants to Reseller a non-exclusive, non-assignable, worldwide right to use the SLING TV Solution solely to provide services to End-Clients. Except to the extent expressly authorized or permitted in this Agreement or by applicable law without the possibility of contractual waiver, Reseller shall not: (i) copy, transfer or distribute the SLING TV Solution, (ii) reverse assemble, reverse engineer, reverse compile, or otherwise translate any portion of the SLING TV Solution, or (iii) sublicense or assign the license conveyed to Reseller herein. b) Additional Services. During the term of this Agreement, Reseller may increase or decrease the services of the SLING TV Solution by making appropriate changes in the SLING TV Control Panel, and such changes will become effective generally within twenty-four (24) hours after such changes have been made. Fees will be affected as described in Section 7. c) Updates. From time to time and in SLING TV's discretion, SLING TV may implement Updates which shall be provided free of charge to Reseller. Updates shall include new or additional service offerings, or support or training services as determined by SLING TV. d)Branding. Reseller may elect to re-brand the SLING TV Solution under Reseller's brand name (Private Label) and provide SLING TV Solution-based services under Reseller's label. In any event, the parties agree that (i) Reseller, and not SLING TV, shall determine the prices and terms upon which Reseller's services are offered to End-Clients; (ii) Reseller is an independent purchaser and reseller of the SLING TV Solution, and shall not be considered an agent or legal representative of SLING TV for any purpose, and neither Reseller nor any director, officer, agent or employee of Reseller, shall be, or be considered, an employee or agent of SLING TV for any purpose whatsoever. Further, Reseller is not granted and shall not exercise any right or authority to assume or create any obligation or responsibility on behalf of or in the name of SLING TV, including without limitation contractual obligations and obligations based on

THIS DOCUMENT CONTAINS PROPRIETARY AND CONFIDENTIAL INFORMATION OF DISH NETWORK AND SHALL NOT BE USED, DISCLOSED OR REPRODUCED, IN WHOLE OR IN PART, FOR ANY PURPOSE WITHOUT THE PRIOR WRITTEN CONSENT OF DISH NETWORK OR IT'S SUBSIDIARY SLING TV, LLC.

warranties or guarantees. Except as specifically provided in this Agreement, the operations of Reseller under this Agreement are subject to the sole control and management of Reseller. Reseller hereby warrants and represents that SLING TV provides the content available via the SLING TV Control Panel for use of the Reseller's Private Label, however, Reseller will not violate the intellectual property rights of any third party for any use other than the SLING TV Solution. e) Promotion. Reseller is hereby granted the right to create and distribute promotional materials and product manuals for the SLING TV Solution sold under the Reseller Label and, as part of that process, Reseller may use and modify the promotional materials and product manuals provided by SLING TV to Reseller. 4) Order for Service a) Reseller will process all Service Orders via the SLING TV Control Panel. b) For items not contained within the SLING TV Control Panel, the SLING TV will respond with a Custom Quote for services along with an estimated time frame to implement Custom Services. c) Reseller shall have five (5) business days from SLING TV's delivery of the Custom Service to test and accept service.

## 5) Secure Access

a) SLING TV shall provide Reseller with a unique user name and password (collectively, "Security Information") that will permit Reseller to access and use the SLING TV Control Panel. The Security Information shall be permanently linked to the email address initially provided by Reseller to SLING TV; therefore, if Reseller modifies or ceases its use of its email address, Reseller shall be required to re-register with SLING TV and obtain new Security Information. SLING TV shall have the right to assume, and rely upon, the authenticity of any order placed through the SLING TV Control Panel using Reseller's Security Information. Reseller shall keep the Security Information confidential and shall be exclusively responsible for the security and integrity of the Security Information. Reseller shall promptly notify SLING TV in the event that Reseller knows or has reason to know that its Security Information has been accessed in an unauthorized manner or compromised to any extent. SLING TV shall have no responsibility for, and shall be held harmless by Reseller against, any orders fulfilled by SLING TV that were not requested by Reseller, but which were the result of a request placed through the SLING TV Control Panel using Reseller's Security Information.

## 6) Demo Accounts

a) A limited number of Demo accounts may be provided to the Reseller free of charge to be used to entice end clients to try the SLING TV Solution- on a very limited time basis and then sign up for the service.

## 7) Pricing – Purchases - Payment

a) The SLING TV Control Panel has the current version of SLING TV Solution pricing. Prices on the SLING TV Control Panel are final, and are not subject to set-off, discount or modification whatsoever without SLING TV's express written permission. b) For each Client site set up, the minimum pricing increment for the SLING TV Solution is a monthly charge. There is no proration for periods less than one month. c) Reseller will be charged automatically for the services each calendar month during each and every month in which this Agreement is in effect. If there was no usage, no charges will be applied. d) For the first month when the SLING TV Solution is implemented and activated, Reseller will be charged for one full month of service-- along with any set up fees. e) There is no monthly minimum usage, and there is no volume discount associated with this Agreement. SLING TV may change the prices charged under this Agreement at any time upon three (3) months prior notice. Failure of the Reseller to terminate the service will be interpreted as acceptance of the new prices. f) Invoices are sent out in thirty (30) day cycles. All invoices shall be paid in full no later than by the first day of each month after the invoice has been issued. Late payments shall be subject to interest at the lesser of 1.5% per month or the highest interest rate permitted by law (in each case, calculated as of the date when such payment is due). g) All Fees are reported in, and shall be paid in, U.S. dollars. h) Payment may be made by electronic funds transfer, check or wire transfer. i) Reseller shall indemnify and hold SLING TV harmless for and against any and all claims, causes of action, expenses, losses, costs or fees incurred by Reseller or any End-Client.

## 8) Warranties

a) SLING TV represents and warrants that (i) it has the corporate authority to enter into this Agreement and to be bound by the terms contained herein, (ii) it holds all right, title and interest in and to the SLING TV Solution and/or is an authorized licensor of all elements of the SLING TV Solution, and has the authority to grant the licenses described in this Agreement, (iii) services provided by SLING TV will be performed by persons having skills and expertise appropriate for the tasks to which such persons are assigned, and (iv) the SLING TV Solution will work in material compliance with its functions and features. b) SLING TV warrants that the SLING TV Solution does not violate the intellectual property rights of any third party. c) This Section (8) describes all warranties provided to Reseller under this Agreement. Unless otherwise expressly stated in this Agreement, SLING TV shall not provide, and hereby expressly waives, all warranties including but not limited to implied warranties of merchantability and fitness for a particular purpose. The SLING TV Solution is provided to Reseller on an "as is" basis, and SLING TV does not warrant or represent that the SLING TV Solution will be suitable for Reseller's specific needs, or that there is any particular market for the SLING TV Solution, or that Reseller's activities hereunder will be profitable.

## 9) Limitation of Liability

RESELLER AGREES THAT SLING TV SHALL NOT BE LIABLE FOR ANY LOSS OF DATA, LOSS OF INCOME OR PROFITS, BUSINESS INTERRUPTION, LOSS OF OPPORTUNITY, OR COST OF RECOVERY ARISING FROM THE USE OF THE SLING TV SOLUTION. a) Security. At all times SLING TV shall use reasonable care, which in all cases shall be no less than industry-standard care, to ensure the security of data and information exchanged or transmitted using the SLING TV Solution. However, the parties acknowledge and agree that the use of any communications technology, including the SLING TV Solution, entails certain unavoidable risks, and that no technology is 100% foolproof or immune from attack. Accordingly, Reseller shall hold SLING TV harmless from and against any claim, cause of action, loss, expense, cost, fine or fee arising from or related to the unintentional or accidental disclosure, misuse, or erasure of the Data, or any breach of security impacting or affecting the SLING TV Solution. b) Availability. The SLING TV Solution relies upon the availability of the data center where the SLING TV Solution is hosted. Although SLING TV makes every reasonable effort to ensure maximum data center availability, there

THIS DOCUMENT CONTAINS PROPRIETARY AND CONFIDENTIAL INFORMATION OF DISH NETWORK AND SHALL NOT BE USED, DISCLOSED OR REPRODUCED, IN WHOLE OR IN PART, FOR ANY PURPOSE WITHOUT THE PRIOR WRITTEN CONSENT OF DISH NETWORK OR IT'S SUBSIDIARY SLING TV, LLC.

is a possibility that the data center may become inaccessible or unavailable as a result of code upgrades, operating system instability, power failures, internet outages or other causes beyond SLING TV's control. c) Remedy. Reseller must request the credit from SLING TV in writing within thirty (30) days of the failure. Credits shall be applied only against future fees for the service.

## 10) Term - Termination

a) Term. This Agreement shall take effect on the date the Reseller is assigned credentials to the SLING TV Control Panel ("Effective Date") and shall continue in force for three (3) years from the Effective Date. If not terminated, this Agreement will automatically renew annually, perpetually. b) Upon termination, the Reseller shall not represent that it has any right to market or distribute Services or Services using any SLING TV Trademark. All embodiments of SLING TV Trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, and sales aids of every kind shall remain the property of SLING TV. c) Consequences for Termination. In the event of termination by either party in accordance with any of the provisions of this Agreement, neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of SLING TV or Reseller. Termination shall not, however, relieve either party of obligations incurred prior to the termination. d) Termination by SLING TV; For Cause. SLING TV may terminate this Agreement immediately if Reseller commits a material default under this Agreement and such default is not cured by Reseller within ten (10) days after default. e) Termination; Without Cause. Reseller may terminate this Agreement for any reason upon providing written notice of termination to SLING TV no less than seven (7) calendar days prior to the effective date of termination. SLING TV may terminate this Agreement for any reason upon providing Reseller with written notice of termination no less than three (3) months prior to the effective date of termination. f) Termination; Mutual Consent. This Agreement may be terminated upon the mutual, written consent of the parties. g) Reseller is responsible for all fees accrued prior to the termination date. There is no proration for periods of less than one month. h) The Reseller is responsible to move any and all data from the SLING TV Solution prior to the termination of services. i) No Liability for Termination. SLING TV shall not be liable to Reseller or any third party for any compensation, reimbursement, losses, expenses, costs or damages arising from or related to, directly or indirectly, the termination of this Agreement for any reason. This waiver of liability shall include, but shall not be limited to, the loss of actual or anticipated profits, anticipated or actual sales, and of expenditures, investments, or commitments in connection with Reseller's or any third party's goodwill or business.

## 11) Confidentiality

The term "Confidential Information" means the following information made available to the Reseller by the SLING TV before and after the date of this Agreement: (a) information transmitted in written, oral, magnetic, electronic or any other medium; (b) all copies and reproductions, in whole or in part, of such information; and (c) all summaries, analyses, compilations, studies, notes, records and works of authorship which contain, reflect, or are generated or derived from such information. Confidential Information shall not include information that: (d) has become part of the public domain through no act or omission of the Reseller; (e) was lawfully disclosed to the Reseller without restriction on disclosure by a third party; (f) was developed independently by the Reseller; or (g) is or was lawfully and independently provided to the Reseller prior to disclosure hereunder, from a third party who is not and was not subject to an obligation of confidentiality or otherwise prohibited from transmitting such information.

*Use.* Each party hereby agrees that the Confidential Information of the SLING TV shall be used solely for the purpose of the Transaction and agrees to reveal Confidential Information only to its affiliates, subsidiaries, directors, officers, employees and agents (collectively "Affiliates") on a "need to know" basis. Each party agrees that, at all times, a Reseller's disclosure to its Affiliates shall be tailored to reveal only the minimum amount of information necessary to fulfill the Reseller's duties or obligations hereunder.

*Advisors.* Unless expressly authorized under this Agreement, a Reseller shall not disclose to any third party any of the SLING TV's Confidential Information without the SLING TV's prior written consent; provided, however, that the Reseller may disclose Confidential Information to its respective accountants, attorneys and other confidential advisors (collectively, "Advisors") who need to know such information for the purpose of assisting the Reseller in connection with the Transaction. Reseller agrees to be responsible for any breach of this Agreement by its Affiliates and Advisors, and Reseller agrees that its Affiliates and Advisors will be advised by Reseller of the confidential nature of such information and shall agree to be bound by this Agreement.

*Transaction.* Neither party nor its Affiliates or Advisors, without the prior written consent of the other party, will disclose to any person the fact that Confidential Information has been provided, that discussions or negotiations are taking place with respect to the Transaction, or the terms, conditions, or other facts of such Transaction, including the status thereof.

*Due Care.* Reseller shall exercise the same degree of care with respect to the Confidential Information it receives from SLING TV as Reseller normally takes to safeguard and preserve its own confidential and proprietary information, which in all cases shall be at least a commercially reasonable level of care.

Information", "Intellectual Property" or "IP" means or includes, but not be limited to, information which relates to:

    A.    Pricing and Price Lists as specified in the Reseller Price List and as presented to Reseller in the Control Panel;

    B.    Financial information about, or relating to, sales, financial projections, production and/or operational costs and profit and loss margins.

    C.    Engineering, business, software and/or hardware processes, settings, specifications or configurations;

    D.    Current or prospective clients or customers.

    E.    Former, current or prospective SLING TV Reseller, Authorized Partners or Sales Agents

    F.    Market information, analysis or research not generally available to the public;

THIS DOCUMENT CONTAINS PROPRIETARY AND CONFIDENTIAL INFORMATION OF DISH NETWORK AND SHALL NOT BE USED, DISCLOSED OR REPRODUCED, IN WHOLE OR IN PART, FOR ANY PURPOSE WITHOUT THE PRIOR WRITTEN CONSENT OF DISH NETWORK OR IT'S SUBSIDIARY SLING TV, LLC.

        G.      Marketing materials, training materials and processes not generally available to the public

        H.      Recipient Software, software code (whether as a whole or part) or software tools.

## 12) Ownership - Intellectual Property

a) At all times, SLING TV is and shall remain the sole and exclusive owner and licensor of the SLING TV Solution and any and all trademarks, copyrights, patents, works of authorship, property rights and goodwill relating to the SLING TV Solution (collectively, "SLING TV's Intellectual Property Rights"). Reseller shall not take any action, directly or indirectly, that injures or diminishes, or may tend to injure or diminish, any of SLING TV's Intellectual Property Rights, nor shall Reseller encourage any third person to do so. Reseller agrees to inform SLING TV immediately of any infringement of any of SLING TV's intellectual Property Rights of which the Reseller may become aware. b) If Reseller, in the course of re-branding the SLING TV Solution or otherwise exercising its rights under this Agreement, acquires any goodwill or reputation in or to any of the SLING TV Solution, all such goodwill or reputation shall automatically be transferred to and shall vest in SLING TV when and as, on an on-going basis, such acquisition of goodwill or reputation occurs, as well as at the expiration or termination of this Agreement, without any separate payment or other consideration of any kind to Reseller, and Reseller agrees to take all such actions necessary to effect such vesting.

## 13) Indemnification

Reseller shall indemnify and hold SLING TV harmless from and against any and all claims, expenses, losses, demands, fees (including reasonable attorneys' fees), costs and causes of action arising from or related to (i) Reseller's performance under this Agreement, or (ii) the breach by Reseller of any representation, covenant or warranty provided by Reseller to SLING TV under this Agreement (collectively, "Claims"). SLING TV shall have the right to control the reasonable disposition and settlement of any Claims and Reseller agrees to cooperate with SLING TV in the administration, handling, and settlement of all Claims.

## 14) Miscellaneous

a) Force Majeure. Neither party shall be liable for any delay or failure to perform hereunder due to floods, riots, strikes, freight embargoes, acts of God, acts of war or hostilities of any nature, laws or regulations of any government (whether foreign or domestic, federal, state, county or municipal) or any other similar cause beyond the reasonable control of the party affected. A party relying on such an event to excuse its performance hereunder shall, as soon as reasonably possible, notify the other party in writing of the nature of that event and the prospects for that party's future performance and shall thereafter, while that event continues, respond promptly and fully in writing to all reasonable requests for information from the other party relating to that event and those prospects. b) Waivers; Amendments. The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. No amendment or waiver of any provision of this Agreement shall be effective unless it is in writing, and it is signed by the party against which it is sought to be enforced. Upon mutual acceptance and execution of an Amendment, the terms of such Amendment shall be deemed incorporated into this Agreement. To the extent that an Amendment conflicts with the terms of this Agreement, the Amendment shall control. c) Severability. If any provision of this Agreement is held to be void, the remaining provisions shall remain valid and shall be construed in such a manner as to achieve their original purposes in full compliance with the applicable laws and regulations. d) Merger. This Agreement is the sole and complete statement of the obligations and rights of the parties as to all matters covered by this Agreement, and supersedes all previous or contemporaneous understandings, agreements, negotiations and proposals relating thereto. The parties agree that no promises or inducements have been offered or made to Reseller (other than those expressly stated in this Agreement) to induce Reseller to enter into this Agreement and to be bound by the terms contained herein. e) Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors. This Agreement shall not be assigned by Reseller without the prior written consent of SLING TV, which shall not be unreasonably withheld. f) Captions. Captions contained in this Agreement are inserted only as a matter of convenience or for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision of this Agreement. g) Attorneys' Fees. If SLING TV commences any action or proceeding against Reseller to enforce the terms of this Agreement, SLING TV shall be entitled to an award against Reseller for all reasonable attorneys' fees, costs and expenses incurred by SLING TV in connection with such action or proceeding (including any mediation or arbitration, and at all levels of trial and appeal), and in connection with the enforcement of any judgment or order thereby obtained. h) Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Colorado. The parties agree that the sole and exclusive venue for any and all issues, claims, causes of action or matters arising from or related to this Agreement shall be in the state courts of Arapahoe County, Colorado or, for federal claims and pendant state claims, the Federal Court in and for the United States District Court for the District of Colorado. i) Notices. Whenever under the provisions of this Agreement, notice is required or permitted to be given to Reseller, SLING TV may deliver such notice(s) to Reseller by electronic mail ("email"). Email notice shall be deemed given to Reseller when such notice is sent to the last known email address provided to SLING TV by Reseller, regardless of whether such email address is functional or not. Notwithstanding any provision to the contrary, however, email notice to SLING TV shall be effective only if SLING TV subsequently acknowledges receipt of Reseller's email via a return email to Reseller in which Reseller's original email is either referenced or reproduced. Notice provided in any method other than by email shall be deemed given either when delivered personally, or by courier, or by facsimile machine with printed transmittal confirmation sheet; or, three (3) days after mailing, postage prepaid by registered or certified mail, return receipt requested, addressed to the party for whom it is intended with copies provided to the address set forth above or to such other addresses as a party shall hereafter designate in writing to another party. Subject to the terms described herein, the parties acknowledge and agree that electronic mail ("email") and/or digital copies or electronic transmissions satisfy all "writing" requirements under this Agreement. j) Independent Contractor Relationship. The parties are independent contractors to one another, and neither party is an employee, servant, agent, Reseller or involved in joint venture of the other party. k) Business Day. If any time period set forth in this Agreement expires on a day other than a business day in Arapahoe County, Colorado, i.e., on a Saturday, Sunday or legal holiday, such period shall be extended to and through the next succeeding business day in Arapahoe County,

THIS DOCUMENT CONTAINS PROPRIETARY AND CONFIDENTIAL INFORMATION OF DISH NETWORK AND SHALL NOT BE USED, DISCLOSED OR REPRODUCED, IN WHOLE OR IN PART, FOR ANY PURPOSE WITHOUT THE PRIOR WRITTEN CONSENT OF DISH NETWORK OR IT'S SUBSIDIARY SLING TV, LLC.

Colorado. ____ No Third-Party Beneficiaries. The parties are entering into this Agreement solely for themselves and no other party, and nothing contained in this Agreement, whether expressed or implied shall be deemed to confer any rights or remedies (including, without limitation, third party beneficiary rights) upon, or obligate either SLING TV or Reseller to, any third person or entity.

SLING TV, LLC
9601 S. Meridian Blvd.
Englewood, CO 80112-5905

One Box TV, LLC
1702 1ˢᵗ Street E. Booth 22
Bradenton, FL 34208

THIS DOCUMENT CONTAINS PROPRIETARY AND CONFIDENTIAL INFORMATION OF DISH NETWORK AND SHALL NOT BE USED, DISCLOSED OR REPRODUCED, IN WHOLE OR IN PART, FOR ANY PURPOSE WITHOUT THE PRIOR WRITTEN CONSENT OF DISH NETWORK OR IT'S SUBSIDIARY SLING TV, LLC.

# EXHIBIT

# 2



HOME    FOR RESELLERS    FOR BUSINESSES    CLOUD NEWS    ABOUT US    BROCHURES

EVENTS    CONTACT US

# Reseller Application and License Agreement

Fields marked with a * are required

# PLEASE COMPLETE ALL FIELDS TO PROPERLY SEND RESELLER AGREEMENT!

This Reseller Application and License Agreement ("Agreement") is between EME CLOUD, LLC., a Florida Limited Liability Company ("EmeCloud"), with its principal offices located at 1401 Manatee Ave. W., Bradenton, FL 34205 and the entity ("Reseller") named at the end of this agreement on the signature lines provided. This Agreement is intended to be governed by the Florida Electronic Transactions Act. You manifest your assent to the terms in this document by any act demonstrating your intent to agree, including clicking any button containing the words "I agree" or similar syntax, below. You agree that electronic communication (including email) between EmeCloud and you, both now and in the future, is an acceptable and reasonable means of communication. It is suggested that you print this Agreement for your records. If you are unable to print this Agreement, please contact EmeCloud and we will supply you with a copy of this Agreement.

## Recitals

A. EmeCloud is the designer and producer of a unique IT solution that is intended to provide a fully functional cloud IT environment through a combination of certain proprietary software and processes (collectively, "EmeCloud Solution"). B. Reseller desires to acquire a limited use license for the components comprising the EmeCloud Solution from EmeCloud, private label the solution if they so choose, and then resell the EmeCloud Solution to Reseller's end user clients ("Clients") under Reseller's designated trade name. NOW THEREFORE, for the mutual promises and

covenants described in this Agreement, EmeCloud and Reseller hereby agree as follows:

## Terms & Conditions

## 1) **Definitions.**

a) "Entity" shall mean any natural person, corporation, general Resellership, limited Resellership, limited liability company or Resellership, proprietorship, other business organization, trust, union, association or governmental authority. b) "Reseller" means any entity that distributes, resells, or markets products developed and/or hosted by EmeCloud. c) "EmeCloud Solution" shall mean and include the combination of all hardware and software designated by EmeCloud as comprising the EmeCloud Solution which may be modified or updated by EmeCloud from time to time. d) "EmeCloud Trademarks" means all names, marks, logos, designs, trade address and other brand designation used by EmeCloud in connection with the EmeCloud Solution. e) "Agreement" shall mean, collectively, this Reseller Application and License Agreement, including all exhibits, schedules and documents referenced herein. f) "Confidential Information" shall have that definition ascribed to it in Section 10, below. g) "End-Client" shall mean any Entity for whom Reseller provides one or more elements of the EmeCloud Solution. h) "EmeCloud Control Panel" shall mean the EmeCloud Reseller website that allows users to add, remove or otherwise manipulate the elements of the EmeCloud Solution. i) "Private Label" shall mean that definition ascribed to it in Section 3(d), below. j) "Service Order" shall mean the form designated by EmeCloud to be used by Reseller to purchase products or services from EmeCloud and/or to license software from EmeCloud accessed in the EmeCloud Control Panel. The form may be amended from time to time by EmeCloud. k) "Service Level Agreement" (SLA) describes the various types of services and service levels that will be provided to Reseller by EmeCloud as indicated in Exhibit A.

## 2) Restrictions.

a) Non-Circumvention. During the term of this Agreement, except as expressly provided in this Agreement, EmeCloud shall not intentionally communicate with any End-Client about the EmeCloud Solution so long as EmeCloud is made aware of the identity of Reseller's End-Clients. The parties agree that Reseller and/or Reseller's designated agent shall be the primary point of contact with each End-Client. b) Non-Solicitation. EmeCloud agrees that during the term of this Agreement and for a period of twelve (12) months thereafter, EmeCloud shall refrain from soliciting Reseller's End-Clients for the provision of the EmeCloud Solution. This prohibition shall not apply where EmeCloud terminates this Agreement For Cause (See Section 10). The parties acknowledge and agree that advertisements and solicitations of EmeCloud that are directed toward the public in general, or business discussions initiated by Reseller's End-Clients, shall not be a breach of this section. c) Nondisclosure. EmeCloud further agrees not to disclose any information to any third party that identifies End-Client or End-Client's use of the EmeCloud Solution without the express written consent of Reseller. Notwithstanding the forgoing, EmeCloud shall be permitted to collect and report information about the use of the EmeCloud Solution by Resellers and End-Clients for EmeCloud's research purposes, provided however, that such information is collected and used in a de-identified manner. d) Opportunity Registration. If the Reseller registers his opportunities and complies with the requirements of the Registration Program, EmeCloud will protect the end-client opportunity.

## 3) Services. Branding.

a) License Grant. Subject to Reseller's material compliance with the terms of this Agreement, EmeCloud hereby grants to Reseller a non-exclusive, non-assignable, worldwide right to use the EmeCloud Solution solely to provide services to End-Clients. Except to the extent expressly authorized or permitted in this Agreement or by applicable law without the possibility of contractual waiver, Reseller shall not: (i) copy, transfer or distribute the EmeCloud Solution, (ii) reverse assemble, reverse engineer, reverse compile, or otherwise translate any portion of the EmeCloud Solution, or (iii) sublicense or assign the license conveyed to Reseller herein. b) Additional Services. During the term of this Agreement, Reseller may increase or decrease the services of the EmeCloud Solution by making appropriate changes in the EmeCloud Control Panel, and such changes will become effective generally within twenty four (24) hours after such changes have been made. Fees will be affected as described in Section 7. c) Updates. From time to time and in EmeCloud's discretion, EmeCloud may implement Updates which shall be provided free of charge to Reseller. Updates shall not include new or additional service offerings, or support or training services, all of which may be subject to separate pricing schedules as determined by EmeCloud. d)Branding. Reseller may elect to re-brand the EmeCloud Solution under Reseller's brand name (Private Label) and provide EmeCloud Solution-based services under Reseller's label. In any event, the parties agree that (i) Reseller, and not EmeCloud, shall determine the prices and terms upon which Reseller's services are offered to End-Clients; (ii) Reseller is an independent purchaser and reseller of the EmeCloud Solution, and shall not be considered an agent or legal representative of EmeCloud for any purpose, and neither Reseller nor any director, officer, agent or employee of Reseller, shall be, or be considered, an employee or agent of EmeCloud for any purpose whatsoever. Further, Reseller is not granted and shall not exercise any right or authority to assume or create any obligation or responsibility on behalf of or in the name of EmeCloud, including without limitation contractual obligations and obligations based on warranties or guarantees. Except as specifically provided in this Agreement, the operations of Reseller under this Agreement are subject to the sole control and management of Reseller. Reseller hereby warrants and represents that any and all trademarks included in or comprising the Private Label do not violate the intellectual property rights of any third party. e) Promotion. Reseller is hereby granted the right to create and distribute promotional materials and product manuals for the EmeCloud Solution sold under the Reseller Label and, as part of that process, Reseller may use and modify the promotional materials and product manuals provided by EmeCloud to Reseller. 4) Order for Service a) Reseller will process all Service Orders via the EmeCloud Control Panel. b) For items not contained within the EmeCloud Control Panel, the EmeCloud will respond with a Custom Quote for services along with an estimated time frame to implement Custom Services. c) Reseller shall have five (5) business days from EmeCloud's delivery of the Custom Service to test and accept service. Billing will not commence until the next business cycle.

## 5) Secure Access

a) EmeCloud shall provide Reseller with a unique user name and password (collectively, "Security Information") that will permit Reseller to access and use the EmeCloud Control Panel. The Security Information shall be permanently linked to the email address initially provided by Reseller to EmeCloud; therefore, if Reseller modifies or ceases its use of its email address, Reseller shall be required to re-register with EmeCloud and obtain new Security Information. EmeCloud shall have the right to assume, and rely upon, the authenticity of any order placed through the EmeCloud Control Panel using Reseller's Security Information. Reseller shall keep the Security Information confidential, and shall be exclusively responsible for the security and integrity of the Security Information. Reseller shall promptly notify EmeCloud in the event that Reseller knows or has reason to know that its Security Information has been accessed in an unauthorized manner or

compromised to any extent. EmeCloud shall have no responsibility for, and shall be held harmless by Reseller against, any orders fulfilled by EmeCloud that were not requested by Reseller but which were the result of a request placed through the EmeCloud Control Panel using Reseller's Security Information.

## 6) Demo Accounts.

a) A limited number of Demo accounts may be provided to the Reseller free of charge to be used to entice end clients to try the EmeCloud Solution- on a very limited time basis and then sign up for the service.

## 7) Pricing; Purchases. Payment.

a) The EmeCloud Control Panel has the current version of EmeCloud Solution pricing. Prices on the EmeCloud Control Panel are final, and are not subject to set-off, discount or modification whatsoever without EmeCloud's express written permission. The EmeCloud Control Panel may have additional terms and conditions that limit, modify or otherwise govern the terms of the Service Orders, and Reseller is hereby advised to read all terms contained on the EmeCloud Control Panel before finalizing Reseller's order. b) For each Client site set up, the minimum pricing increment for the EmeCloud Solution is a monthly charge. There is no proration for periods less than one month. c) Reseller will be charged automatically for the products each calendar month during each and every month in which this Agreement is in effect. If there was no usage, no charges will be applied. d) For the first month when the EmeCloud Solution is implemented and activated, Reseller will be charged for one full month of service-- along with any set up fees. e) There is no monthly minimum usage, and there is no volume discount associated with this Agreement. EmeCloud may change the prices charged under this Agreement at any time upon three (3) months prior notice. Failure of the Reseller to terminate the service will be interpreted as acceptance of the new prices. f) Invoices are sent out in 30 day cycles. All invoices shall be paid in full no later than by the first day of each month after the invoice has been issued. Late payments shall be subject to interest at the lesser of 1.5% per month or the highest interest rate permitted by law (in each case, calculated as of the date when such payment is due). g) All Fees are reported in, and shall be paid in, U.S. dollars. h) Payment may be made by credit card, electronic funds transfer or wire transfer. i) Unless otherwise agreed to in writing by EmeCloud or prohibited by law, Reseller shall pay all federal, state and local tax, transportation tax and other tax imposed on EmeCloud (other than tax on EmeCloud's income) resulting from the parties' activities hereunder. j) Remedies. EmeCloud will begin attempts to rectify rejected credit card payments immediately and unpaid invoice balances 10 days after payment due dates. Failure to submit payment within 10 days shall constitute a material breach of this Agreement and such a failure shall provide EmeCloud with the right (but not the obligation) to automatically terminate this Agreement. Reseller understands and agrees that if Reseller fails to pay the Fees when due, EmeCloud reserves the right to disable the EmeCloud Solution to Reseller and/or End-Clients, in part or in whole, until Reseller's payment is made in full. Reseller shall indemnify and hold EmeCloud harmless for and against any and all claims, causes of action, expenses, losses, costs or fees incurred by Reseller or any End-Client resulting from the suspension of services hereunder.

## 8) Warranties;

a) EmeCloud represents and warrants that (i) it has the corporate authority to enter into this Agreement and to be bound by the terms contained herein, (ii) it holds all right, title and interest in

and to the EmeCloud Solution and/or is an authorized licensor of all elements of the EmeCloud Solution, and has the authority to grant the licenses described in this Agreement, (iii) services provided by EmeCloud will be performed by persons having skills and expertise appropriate for the tasks to which such persons are assigned, and (iv) the EmeCloud Solution will work in material compliance with its functions and features. b) EmeCloud warrants that the EmeCloud Solution does not violate the intellectual property rights of any third party. c) This Section (8) describes all warranties provided to Reseller under this Agreement. Unless otherwise expressly stated in this Agreement, EmeCloud shall not provide, and hereby expressly waives, all warranties including but not limited to implied warranties of merchantability and fitness for a particular purpose. The EmeCloud Solution is provided to Reseller on an "as is" basis, and EmeCloud does not warrant or represent that the EmeCloud Solution will be suitable for Reseller's specific needs, or that there is any particular market for the EmeCloud Solution, or that Reseller's activities hereunder will be profitable.

## 9) Limitation of Liability.

RESELLER AGREES THAT EMECLOUD SHALL NOT BE LIABLE FOR ANY LOSS OF DATA, LOSS OF INCOME OR PROFITS, BUSINESS INTERRUPTION, LOSS OF OPPORTUNITY, OR COST OF RECOVERY ARISING FROM THE USE OF THE EMECLOUD SOLUTION. a) Security. At all times EmeCloud shall use reasonable care, which in all cases shall be no less than industry-standard care, to ensure the security of data and information exchanged or transmitted using the EmeCloud Solution. However, the parties acknowledge and agree that the use of any communications technology, including the EmeCloud Solution, entails certain unavoidable risks, and that no technology is 100% foolproof or immune from attack. Accordingly, Reseller shall hold EmeCloud harmless from and against any claim, cause of action, loss, expense, cost, fine or fee arising from or related to the unintentional or accidental disclosure, misuse, or erasure of the Data, or any breach of security impacting or affecting the EmeCloud Solution. b) Availability. The EmeCloud Solution relies upon the availability of the data center where the EmeCloud Solution is hosted. Although EmeCloud makes every reasonable effort to ensure maximum data center availability, there is a possibility that the data center may become inaccessible or unavailable as a result of code upgrades, operating system instability, power failures, internet outages or other causes beyond EmeCloud's control. For Service Levels agreed to please refer to Exhibit A. c) Remedy. Reseller must request the credit from EmeCloud in writing within thirty (30) days of the failure. Credits shall be applied only against future fees for the service.

## 10) Term; Termination.

a) Term. This Agreement shall take effect on the date the Reseller is assigned credentials to the EmeCloud Control Panel ("Effective Date") and shall continue in force for three (3) years from the Effective Date. If not terminated, this Agreement will automatically renew annually, perpetually. b) Upon termination, the Reseller shall not represent that it has any right to market or distribute Products or Services using any EmeCloud Trademark. All embodiments of EmeCloud Trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, and sales aids of every kind shall remain the property of EmeCloud. c) Consequences for Termination. In the event of termination by either party in accordance with any of the provisions of this Agreement, neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of EmeCloud or Reseller. Termination

shall not, however, relieve either party of obligations incurred prior to the termination. d) Termination by EmeCloud; For Cause. EmeCloud may terminate this Agreement immediately if Reseller commits a material default under this Agreement and such default is not cured by Reseller within ten (10) days after default. e) Termination; Without Cause. Reseller may terminate this Agreement for any reason upon providing written notice of termination to EmeCloud no less than seven (7) calendar days prior to the effective date of termination. EmeCloud may terminate this Agreement for any reason upon providing Reseller with written notice of termination no less than three (3) months prior to the effective date of termination. f) Termination; Mutual Consent. This Agreement may be terminated upon the mutual, written consent of the parties. g) Reseller is responsible for all fees accrued prior to the termination date. There is no proration for periods of less than one month. h) The Reseller is responsible to move any and all data from the EmeCloud Solution prior to the termination of services. i) No Liability for Termination. EmeCloud shall not be liable to Reseller or any third party for any compensation, reimbursement, losses, expenses, costs or damages arising from or related to, directly or indirectly, the termination of this Agreement for any reason. This waiver of liability shall include, but shall not be limited to, the loss of actual or anticipated profits, anticipated or actual sales, and of expenditures, investments, or commitments in connection with Reseller's or any third party's goodwill or business.

## 11) Confidentiality.

a) Confidentiality is defined as described in the EmeCloud Confidentiality Agreement which must be agreed to prior to becoming a Reseller. b) Each party's obligations under this Section 11 shall survive the termination of this Agreement.

## 12)Ownership; Intellectual Property.

a) At all times, EmeCloud is and shall remain the sole and exclusive owner and licensor of the EmeCloud Solution and any and all trademarks, copyrights, patents, works of authorship, property rights and goodwill relating to the EmeCloud Solution (collectively, "EmeCloud's Intellectual Property Rights"). Reseller shall not take any action, directly or indirectly, that injures or diminishes, or may tend to injure or diminish, any of EmeCloud's Intellectual Property Rights, nor shall Reseller encourage any third person to do so. Reseller agrees to inform EmeCloud immediately of any infringement of any of EmeCloud's intellectual Property Rights of which the Reseller may become aware. b) If Reseller, in the course of re-branding the EmeCloud Solution or otherwise exercising its rights under this Agreement, acquires any goodwill or reputation in or to any of the EmeCloud Solution, all such goodwill or reputation shall automatically be transferred to and shall vest in EmeCloud when and as, on an on-going basis, such acquisition of goodwill or reputation occurs, as well as at the expiration or termination of this Agreement, without any separate payment or other consideration of any kind to Reseller, and Reseller agrees to take all such actions necessary to effect such vesting.

## 13) Indemnification.

Reseller shall indemnify and hold EmeCloud harmless from and against any and all claims, expenses, losses, demands, fees (including reasonable attorneys' fees), costs and causes of action arising from or related to (i) Reseller's performance under this Agreement, or (ii) the breach by Reseller of any representation, covenant or warranty provided by Reseller to EmeCloud under this Agreement (collectively, "Claims"). EmeCloud shall have the right to control the reasonable disposition and settlement of any Claims and Reseller agrees to cooperate with EmeCloud in the

administration, handling, and settlement of all Claims.

# 14) Miscellaneous.

a) Force Majeure. Neither party shall be liable for any delay or failure to perform hereunder due to floods, riots, strikes, freight embargoes, acts of God, acts of war or hostilities of any nature, laws or regulations of any government (whether foreign or domestic, federal, state, county or municipal) or any other similar cause beyond the reasonable control of the party affected. A party relying on such an event to excuse its performance hereunder shall, as soon as reasonably possible, notify the other party in writing of the nature of that event and the prospects for that party's future performance and shall thereafter, while that event continues, respond promptly and fully in writing to all reasonable requests for information from the other party relating to that event and those prospects. b) Waivers; Amendments. The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. No amendment or waiver of any provision of this Agreement shall be effective unless it is in writing, and it is signed by the party against which it is sought to be enforced. Upon mutual acceptance and execution of an Amendment, the terms of such Amendment shall be deemed incorporated into this Agreement. To the extent that an Amendment conflicts with the terms of this Agreement, the Amendment shall control. c) Severability. If any provision of this Agreement is held to be void, the remaining provisions shall remain valid and shall be construed in such a manner as to achieve their original purposes in full compliance with the applicable laws and regulations. d) Merger. This Agreement is the sole and complete statement of the obligations and rights of the parties as to all matters covered by this Agreement, and supersedes all previous or contemporaneous understandings, agreements, negotiations and proposals relating thereto. The parties agree that no promises or inducements have been offered or made to Reseller (other than those expressly stated in this Agreement) to induce Reseller to enter into this Agreement and to be bound by the terms contained herein. e) Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors. This Agreement shall not be assigned by Reseller without the prior written consent of EmeCloud, which shall not be unreasonably withheld. f) Captions. Captions contained in this Agreement are inserted only as a matter of convenience or for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision of this Agreement. g) Attorneys' Fees. If EmeCloud commences any action or proceeding against Reseller to enforce the terms of this Agreement, EmeCloud shall be entitled to an award against Reseller for all reasonable attorneys' fees, costs and expenses incurred by EmeCloud in connection with such action or proceeding (including any mediation or arbitration, and at all levels of trial and appeal), and in connection with the enforcement of any judgment or order thereby obtained. h) Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida. The parties agree that the sole and exclusive venue for any and all issues, claims, causes of action or matters arising from or related to this Agreement shall be in the state courts of Manatee County, Florida or, for federal claims and pendant state claims, the Federal Court in and for the Middle District of Florida. i) Notices. Whenever under the provisions of this Agreement, notice is required or permitted to be given to Reseller, EmeCloud may deliver such notice(s) to Reseller by electronic mail ("email"). Email notice shall be deemed given to Reseller when such notice is sent to the last known email address provided to EmeCloud by Reseller, regardless of whether such email address is functional or not. Notwithstanding any provision to the contrary, however, email notice to EmeCloud shall be effective only if EmeCloud subsequently acknowledges receipt of Reseller's email via a return

email to Reseller in which Reseller's original email is either referenced or reproduced. Notice provided in any method other than by email shall be deemed given either when delivered personally, or by courier, or by facsimile machine with printed transmittal confirmation sheet; or, three (3) days after mailing, postage prepaid by registered or certified mail, return receipt requested, addressed to the party for whom it is intended with copies provided to the address set forth above or to such other addresses as a party shall hereafter designate in writing to another party. Subject to the terms described herein, the parties acknowledge and agree that electronic mail ("email") and/or digital copies or electronic transmissions satisfy all "writing" requirements under this Agreement. j) Independent Contractor Relationship. The parties are independent contractors to one another, and neither party is an employee, servant, agent, Reseller or joint venturer of the other party. k) Business Day. If any time period set forth in this Agreement expires on a day other than a business day in Manatee County, Florida, i.e., on a Saturday, Sunday or legal holiday, such period shall be extended to and through the next succeeding business day in Manatee County, Florida. l) No Third Party Beneficiaries. The parties are entering into this Agreement solely for themselves and no other party, and nothing contained in this Agreement, whether expressed or implied shall be deemed to confer any rights or remedies (including, without limitation, third party beneficiary rights) upon, or obligate either EmeCloud or Reseller to, any third person or entity.

## AGREED AND ACCEPTED (fields required in the electronic form)

Date *

Company Name *

Company Address 1 *

Company Address 2

Company City *

Company State or Region (abbreviations preferred) *



HOME     FOR RESELLERS     FOR BUSINESSES     CLOUD NEWS     ABOUT US     BROCHURES

EVENTS     CONTACT US

# EmeCloud Confidentiality Agreement

Fields marked with a * are required

## Please Complete All Fields to Properly Send the NDA!

### CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made by and between **EME CLOUD, LLC**, a Florida Limited Liability Company ("EmeCloud"), with its principal offices at 1401 Manatee Ave. W., Bradenton, FL 34205,and the entity ("Entity") named at the end of this agreement (hereby collectively referred to as "Parties" or individually referred to as "Party")

This Agreement is intended to be governed by the Florida Electronic Transactions Act. You manifest your assent to the terms in this document by any act demonstrating your intent to agree, including clicking any button containing the words "I agree" or similar syntax, below.

You agree that electronic communication (including email) between EmeCloud and you, both now and in the future, is an acceptable and reasonable means of communication. It is suggested that you print this Agreement for your records. If you are unable to print this Agreement, please contact EmeCloud and we will supply you with a copy of this Agreement.

A. The parties anticipate participating in ongoing business relations and/or discussions with each other (the "Transaction") that will involve the disclosure of Confidential Information (defined below); and,

B. The parties desire to set forth each other's rights and obligations with respect to the use, dissemination and protection of the Confidential Information.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is understood and

agreed as follows:

- - - - - - - - -

1. **Parties.** The party being furnished Confidential Information about or relating to the Transaction, directly or indirectly, is referred to herein as the "Recipient", and the party furnishing or providing such information is referred to herein as the "Discloser".

2. **Permitted Use.**

   A. *Defined.* The term "Confidential Information" means the following information made available to the Recipient by the Discloser before and after the date of this Agreement: (i) information transmitted in written, oral, magnetic, electronic or any other medium; (ii) all copies and reproductions, in whole or in part, of such information; and (iii) all summaries, analyses, compilations, studies, notes, records and works of authorship which contain, reflect, or are generated or derived from such information. Confidential Information shall not include information that: (w) has become part of the public domain through no act or omission of the Recipient; (x) was lawfully disclosed to the Recipient without restriction on disclosure by a third party; (y) was developed independently by the Recipient; or (z) is or was lawfully and independently provided to the Recipient prior to disclosure hereunder, from a third party who is not and was not subject to an obligation of confidentiality or otherwise prohibited from transmitting such information.

   B. *Use.* Each party hereby agrees that the Confidential Information of the Discloser shall be used solely for the purpose of the Transaction, and agrees to reveal Confidential Information only to its affiliates, subsidiaries, directors, officers, employees and agents (collectively "Affiliates") on a "need to know" basis. Each party agrees that, at all times, a Recipient's disclosure to its Affiliates shall be tailored to reveal only the minimum amount of information necessary to fulfill the Recipient's duties or obligations hereunder.

   C. *Advisors.* Unless expressly authorized under this Agreement, a Recipient shall not disclose to any third party any of the Discloser's Confidential Information without the Discloser's prior written consent; provided, however, that the Recipient may disclose Confidential Information to its respective accountants, attorneys and other confidential advisors (collectively, "Advisors") who need to know such information for the purpose of assisting the Recipient in connection with the Transaction. Recipient agrees to be responsible for any breach of this Agreement by its Affiliates and Advisors, and Recipient agrees that its Affiliates and Advisors will be advised by Recipient of the confidential nature of such information and shall agree to be bound by this Agreement.

   D. *Transaction.* Neither party nor its Affiliates or Advisors, without the prior written consent of the other party, will disclose to any person the fact that Confidential Information has been provided, that discussions or negotiations are taking place with respect to the Transaction, or the terms, conditions, or other facts of such Transaction, including the status thereof.

   E. *Due Care.* Recipient shall exercise the same degree of care with respect to the Confidential Information it receives from Discloser as Recipient normally takes to safeguard and preserve its own confidential and proprietary information, which in all cases shall be at least a commercially reasonable level of care.

3. **Information", "Intellectual Property"** or **"IP"** means or includes, but not be limited to, information which relates to:

A. Pricing and Price Lists as specified in the Reseller Price List and as presented to Reseller in the Control Panel;

B. Financial information about, or relating to, sales, financial projections, production and/or operational costs and profit and loss margins.

C. Engineering, business, software and/or hardware processes, settings, specifications or configurations;

D. Current or prospective clients or customers.

E. Former, current or prospective Eme Channel Reseller, Authorized Partners or Sales Agents

F. Market information, analysis or research not generally available to the public;

G. Marketing materials, training materials and processes not generally available to the public

H. Software, software code (whether as a whole or part) or software tools.

4. **Ownership.** Recipient acknowledges and agrees that any Confidential Information of the Discloser, in whatever form or format such information is conveyed or disclosed, is the sole and exclusive property of Discloser. Recipient agrees that upon the request of, and as directed by, Discloser, Recipient shall either (at the election of Discloser) return to Discloser all such information, retaining no copies thereof, or destroy all of Discloser's Confidential Information in Recipient's possession or control and promptly certify to Discloser the information, and all copies of the information, have been destroyed.

5. **Remedies**. The parties acknowledge that all Confidential Information is considered to be proprietary and of competitive value, and in many instances, the trade secrets of Discloser. The parties agree that because of the unique nature of the Confidential Information, any breach of this Agreement would cause irreparable harm and money damages and other remedies available at law in the event of a breach would not be adequate to compensate for any such breach. Accordingly, the non-breaching party shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including, without limitation, injunctive relief and specific performance, as a remedy for any such breach. Such relief shall be in addition to, and not in lieu of, all other remedies available at law or in equity to the non-breaching party.

6. **Compelled Disclosure.** If Recipient or any of its Affiliates or Advisors is legally compelled (whether by deposition, interrogatory, request for documents, subpoena, civil investigation, demand or similar process) to disclose any of the Confidential Information (including the fact that discussions or negotiations are taking place with respect to the Transaction), Recipient shall immediately notify Discloser in writing of such requirement so that Discloser may seek a protective order or other appropriate remedy and/or waive Recipient's compliance with the provisions hereof. Recipient will use its best efforts, at Discloser's expense, to obtain or assist Discloser in obtaining any such protective order. Failing the entry of a protective order or the receipt of a waiver hereunder, Recipient may disclose, without liability hereunder, that portion (and only that portion) of the Confidential Information that Recipient has been advised by written opinion of counsel reasonably acceptable to Discloser that it is legally compelled to disclose; provided, however, that Recipient agrees to use its best efforts to obtain assurance that confidential treatment will be accorded such Confidential Information by the person or persons to whom it was disclosed.

7. **No License.** No license or conveyance of any rights held by either party under any discoveries, inventions,

patents, trade secrets, copyrights, or other form of intellectual property is granted or implied by this Agreement or by the disclosure of any Confidential Information pursuant to this Agreement.

8. **No Obligations**. This Agreement shall not constitute, create, give effect to or otherwise imply (i) a joint venture, pooling arrangement, partnership or formal business organization of any kind, or (ii) any obligation or commitment on either party to submit a proposal or to enter into a further contract or business relationship with the other party, or (iii) any obligation to disclose, supply or otherwise communicate any information, general or specific, to the other party.

9. **No Representations / Warranties.** Each Party understands and agrees that the Discloser is not making any representation or warranty, expressed or implied, as to the accuracy or completeness of the Confidential Information. Discloser shall not be liable to Recipient or to any other person resulting from the permitted disclosure or permitted use of the Confidential Information.

10. **Term; Termination.** This Agreement shall begin on the latest date of the signatures of the parties below, subject only to the exchange of signature pages by the parties. Unless otherwise terminated by the mutual, written consent of both parties, this Agreement shall continue unabated for a term of five (5) years, calculated from the last date on which Confidential Information was exchanged between the parties. Notwithstanding the foregoing, the parties agree that the parties shall never reveal a Discloser's trade secrets to any third party at any time and, further, this covenant to keep trade secrets confidential shall survive the termination of this Agreement.

11. **Miscellaneous.** This Agreement shall bind and inure to the benefit of the parties hereto and their successors and permitted assigns. This Agreement shall be governed by the laws of Florida, without reference to conflict of laws principles. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties. Neither party may assign its rights or obligations hereunder without the other party's written consent. This Agreement may be signed and transmitted electronically in counterparts, and each counterpart shall be deemed an original for all purposes.

**AGREED AND ACCEPTED (fields required in the electronic form)**

Date: *

Company Name: *

First Name: *

Last Name: *

Title/position: *

Email Address: *

Office Number: *

Mobile Number: *

Company Address 1 *

Company Address 2

Company City *

Company State (abbreviations preferred) *

Company Country *

Company Zip Code or Postal Code *

Company Website: *

Case 8:19-cv-02147-JSM-SPF   Document 16-2   Filed 01/30/20   Page 23 of 23 PageID 560

* By clicking this button and submitting this form electronically you are acknowledging and confirm that the fields First and Last Name are legally binding as your "Digital Signature".

EME CLOUD Confidentiality Agreement 2013-3

Copyright 2020 EmeCloud | Powered by: The Real Cloud | Our Privacy Policy